BRANDT v. BROWN.

CANCELLATION OF INSTRUMENTS — CONTRACTS — RESCISSION FOR FRAUD — PURCHASER IN GOOD FAITH.
In a suit to set aside a deed of a right of way formerly owned by the complainant, and of considerable value, a decree for the complainant on the ground that the deed was obtained by fraud, is supported by testimony showing that the defendant promised, as a consideration for the release of the right of way, to convey to the complainant a right of way across other land which he had previously sold without complainant's knowledge, and the decree as to a joint defendant is justified by evidence that the right of way was reconveyed by complainant for the benefit of the joint defendant, whose wife assisted in procuring the same.

Appeal from Van Buren; Des Voignes, J.   Submitted

February 15, 1910.   (Docket No. 5.)   Decided March 5, 1910.

Bill by Agnes Brandt against Philo M. Brown and Hattie B. Brown to set aside a deed on the ground of fraud.   On petition, Lewis F. Algrem was permitted to appear as a party defendant.   From a decree for complainant, defend Algrem appeals.   Affirmed.

*Thomas J. Cavanaugh,* for complainant.

*Barnard & Lewis,* for appellant.

MOORE, J.   The complainant filed her bill of complaint against the defendants Philo M. Brown and Hattie E. Brown, setting forth in substance that a right of way was deeded by defendants Brown to herself and husband by the entireties, and that afterwards the defendant Philo M. Brown procured a deed of the same from complainant and her husband on the promise that he would secure them a right of way across the premises known as the "Reece land."   The defendant Algrem was not made a party defendant by said bill.   Philo M. and Hattie E. Brown filed their answer to the complainant's bill of complaint, denying therein any such promise or undertaking on their part.   Afterwards, on the 5th day of November, the defendant Algrem, by his agent, Mrs. Algrem, filed a petition in said cause praying therein for leave to appear and defend in said cause, and on the 14th of November, A. D. 1908, an order was made granting the prayer. Thereafter the said defendant Algrem filed an answer to the bill of complaint in said cause and specifically averred therein that he owned the land by virtue of a contract dated September 9, 1905, over which said right of way extended, and that the complainant had notice and knowledge of the fact that he had purchased the lands claimed by them.   An answer was filed to this answer by the complainant.   The case was heard in open court.   A de-

cree was granted in favor of complainant as prayed. The case is brought here by appeal.

The accompanying plat will aid in understanding the situation:

Prior to September 9, 1905, the defendant Philo M. Brown was the owner of the four parcels of land, and the right of way shown in the plat. On September 9, 1905, he made a written contract to sell to defendant Algrem the Algrem tract. This contract was recorded June 27, 1906. Mr. Brown testified that when he made the contract he reserved a right of way to the tracts shown on the map as the Brandt tracts. The Reece tract was sold by Mr. Brown July 30, 1907.

March 10, 1906, Mr. Brown sold and deeded to the complainant and her husband by the entireties the two parcels of land shown as the Brandt tracts and the right of

way shown on the map. Some dispute arose between Mrs. Algrem and Mr. Brown about the land contract. On September 7, 1907, Mr. Brown procured from the complainant and her husband a quitclaim deed to the right of way, which deed was recorded September 14, 1907. Later this right of way was conveyed to Algrem by Brown. Mr. Brandt died October 15, 1907. This suit was begun December 5, 1907. The bill of complaint contained the following averment:

"Your oratrix further shows unto the court that some time prior to the 7th day of September, A. D. 1907, the said Philo M. Brown sought out your oratrix and her said husband and implored and requested them to enter into an arrangement and understanding to deed back to him, the said Philo M. Brown and his said wife, the said right of way, and while endeavoring to procure the making of said agreement, held out many promises to your oratrix and her said husband, and eventually agreed with your oratrix and her husband that, if they would convey to the said Philo M. Brown the said right of way, he, the said Philo M. Brown and his wife, Hattie B. Brown, would convey to your oratrix and her said husband a strip of land sufficiently wide to give them passage to and from said lands so purchased by them to said Eighth street, that said way so promised would extend across the west 11½ acres of the northeast quarter of the southwest quarter of said section 29, which said lands the said Philo M. Brown had before that time deeded and conveyed to Carl Reece and his wife, as hereinbefore set forth; that in compliance with said arrangement, and relying upon the promises and agreements made by the said Philo M. Brown and his ability to perform the same, your oratrix and her said husband reconveyed said right of way to the said Philo M. Brown and Hattie B. Brown, his wife."

Mr. and Mrs. Brandt and Mr. Algrem are German, and do not speak English well. The witnesses are not at all agreed as to what occurred. It is the claim of Mr. Brown that late in August or early in September Mrs. Algrem appeared. We quote from the testimony of Mr. Brown:

"*Q*. Was there anything said at any time about fencing this right of way up on Algrem's side?

"*A*. Not until Mrs. Algrem come out and said that—Well, do you want me to tell what she said?

"*Q*. Yes.

"*A*. She came out and said her husband had transferred the right of—the papers to her, the contract, transferred it to her—Mr. Algrem had, and that she wouldn't have a road there. Well, I told her I didn't know how she could hinder herself—Mr. Brandt had a deed of it. Well, she said she wouldn't have it. 'Well,' I says, 'I paid your husband for it,' and it would have to stay right there—have no trouble. Well, she wouldn't have it. Well, I told her that the only way for her to get out of it would be to make some bargain with Mr. Brandt, and have him throw it up; otherwise, it would remain right where it was."

He further testified that Mrs. Algrem entered into negotiations with Mr. Brandt and obtained from him an agreement to surrender the deed; that—

"Mr. Brandt told me to come over, and we would make out the papers—that is how I got it into my head to take Harry Huff and go over to Brandt's. That was the first thing that he said about making out the deed.

"*Q*. How did he come to say that to you?

"*A*. Why, they was talking. Mrs. Algrem had been to him, and he had agreed to surrender the deed, and he told me to come over and we would fix the matter up. That is the reason that I went over there; yes, sir."

Mr. Brown further testified:

"He got that right of way in his deed, and he deeded it back to me; yes, sir. And then, and then only, did I give a deed to Algrem.

"*Q*. What negotiations, if any, passed between you and Mr. Brandt for the purpose of having that right of way deeded back to you?

"*A*. Only conversation that we had that he didn't like the private right of way, and that he would like a public road, and I told him I would use my influence in getting him a public highway. He asked nothing further of me; no, sir. I promised him nothing further than that I would use my influence to get a public right of way; that was all."

Again we quote from his testimony:

"*Q.* That Mrs. Algrem was saying she wanted that scratched off?

"*A.* Yes, sir. I told Mrs. Algrem I had no power to get the right of way back for her. The only way for her to do would be for her to make some arrangements with Mr. Brandt to throw up the right of way. It made no difference to me whether the right of way was thrown up or not; I didn't have any interest in it one way or the other. I didn't consider I was under any obligations to get that back for Algrem; no, sir. Or that it would be any advantage to me in any way to do it.

"*Q.* Why or how did you take any interest in the matter whatever?

"*A.* Nothing; only I sold to Mr. Brandt, and I wanted him to have a right of way out. That is the reason I sacrificed money to give him one.

"*Q.* Why did you have any interest, or take any interest, in getting the matter that Mrs. Algrem was talking about fixed up?

"*A.* Well, she was out there in the neighborhood of a week, I think, and harping the thing continually. She had been over there to see Mr. Brandt alone—that is, I wasn't there—and she claimed that Mr. Brandt misused her. I guess that they had a little 'flare up.' I had no interest in the matter myself, except to get the matter settled between Algrem and Brandt; that is all. There was no talk between myself and Brandt as to where I would try to get, or use my influence to get, the new right of way in any particular place; no, sir."

Mrs. Algrem had a different version of the transaction; she testified:

"I signed a petition to have my husband made a party to this suit. I know Mrs. Brandt and Mr. Brown. Have known Mr. Brown ever since my husband bought this land. I came to Pine Grove with my husband at the time he contracted for the land; yes, sir. I was representing my husband, then; yes, sir. He sent me over. I had some talk with Mr. Brown; yes, sir.

"*Q.* About a right of way there?

"*A.* No, about my own land that I bought from Mr. Brown. The contract run to my husband. I talked with him about the contract; yes, sir.

"*Q.* And you had a talk about a deed that he had given to Mr. Brown?

"*A.* No, I told him that I wanted my land back, for I paid for it. That is what I told Mr. Brown.

"*Q.* Well, you knew that he deeded it to Mr. Brandt?

"*A.* Yes, he did.

"*Q.* You knew that, didn't you?

"*A.* No, I didn't know it, but I found out after a while. I found it out when I came over a year ago last September.

"*Q.* And then did you know that you got it back from Brandt?

"*A.* Yes, I knew after a while. He promised to give it back to me. I remained there until he got it back from Brandt; yes, sir. I didn't know how he got it back from Brandt—I don't know. I know he got a deed. He talked with me and Mrs. Brandt when I went over there a year ago last September. I couldn't just tell you, but it was in the early part of September. There was a deed made while I was over there. I stayed there, yes, sir, until the deed was made.

"*Q.* And you had Mr. Brown go and get it, did you?

"*A.* Yes, Mr. Brown had to get it. I told Mr. and Mrs. Brandt when I went over there that I wanted my land back, and they said that they had it on their deed. It was signed to them by Mr. Brown. I said to them: 'They have signed my husband's land away.' I said that to Mr. and Mrs. Brandt. He was living then. I talked with both of them."

Cross-examination:

"I had a talk with Mr. and Mrs. Brandt. They were both at home; yes, sir. I went over and see Mr. Brandt at one time when his wife was away; yes, sir."

There can be no reasonable doubt that Mrs. Algrem was representing her husband, and that she and Mr. Brown were acting in concert in getting the deed of the right of way from Mr. and Mrs. Brandt. Mrs. Brandt testified that after they bought the two tracts of land and the right of way they built a house and some barns, and that when the dispute arose between Mr. Brown and Mrs. Algrem, and relying upon the promise of Mr. Brown to procure for them a right of way across the tract owned by Mr. Reece,

"The other road was to be straight through the orchard," and without any other consideration they made the quitclaim. We quote from her testimony:

"Before I signed the deed, and when I met Mr. Brown, I told him what my husband told me; yes.

"*Q.* What did he say to that, then ?

"*A.* Well, he says he promised my husband other road. The other road was to be straight through the orchard. Reece owns the land that that would cross now. Mr. Brown didn't pay me any money—not a cent. I was not at home when Mr. Brown and Mr. Huff came there. Mr. Brown was down there many times before that. He was having trouble with Mrs. Algrem. She was going to sue him. And I please my husband to give him this road for other one, and my husband has done it to help him not to have trouble. Mr. Brown many times come over on my place. I say: 'What you want, Mr. Brown?' He says, Mr. Brown, please me to help him be a witness, then I go to Chicago—then I come back. My husband says: 'I deed the road back to Mr. Brown.' The trouble he had with Algrem he got not enough acres. Mrs. Algrem says she got just 10 acres, and the deed calls for 12 acres. Mrs. Algrem come over one time. I had a talk with her. She said: 'I come and close that road.' She says to my husband and me: 'I close you the road.' My husband he say: 'Why?' 'Well,' she say, 'I got not enough acres. I buy 12 and I got just 10 acres, and my deed call for 12 acres.' My husband says: 'My street is deeded in Paw Paw, you could not close me the road;' and then she told me about what neighbors come to my husband and speak it over. I think Mrs. Algrem began coming there in August. My husband and Mrs. Algrem down to Mr. Brown."

It will be seen that the testimony is very contradictory, but there are some things about which there is no dispute. In March, 1906, Mr. and Mrs. Brandt paid Mr. Brown nearly $1,700 for the two tracts of land and the right of way which was deeded to them, and soon thereafter took possession thereof, and used the right of way, and built upon the land near the lake a house and barns of considerable value. Mr. and Mrs. Brandt declined to buy the land unless they could also buy the right

of way. When Mr. Brown obtained from Mr. and Mrs. Brandt a deed of this right of way, the Brandts were without any way of ingress or egress to this very valuable property. It requires a great deal of credulity to believe this valuable right would be deeded upon the bare promise of Mr. Brown to use his influence toward getting a public highway.

It is urged that it is not shown Mr. Algrem did any wrong or was to blame in any way. Mr. Brown testified:

" I had some talk with Mr. Algrem about the making of the deed of this land. I was to sell Mr. Brandt a piece of land in back, and I told Mr. Algrem I couldn't sell him the land west of Mr. Brandt's unless I could have a right of way out for Mr. Brandt. He says: 'I am perfectly willing that you should have a right of way, as I have to have a road up and back;' and he was perfectly willing that Mr. Brandt should use it and have nothing for it. ' Well, now,' I says, 'for fear that there should be something come up that might damage, interfere with your interest, I will throw off $5 an acre for this right of way— 12-foot right of way.' Mr. Algrem was perfectly willing to do that, and we done so. That made $60 for the right of way, which fetched the land down to $70 an acre. He was to pay $75, I threw off $5 on an acre. That was before I made the deed to him; yes, sir. The contract was entered into with that understanding; yes, sir. * * * I think Mr. Algrem wanted once to buy the land that Mr. Brandt now owns—the one on the lake. I don't just remember what the trouble was that I didn't sell. The right of way over the Algrem land was for the benefit of land back of it—no matter whom I sold to; no, sir. And when I did sell the land, I sold the right of way; yes, sir —as part of the consideration for the conveyance; yes, sir.

"*Q.* And Algrem understood that that is what would be done ?

"*A.* That is what he did.

"*Q.* And his wife understood it ?

"*A.* Yes, sir.

"*Q.* And they were paid for that right of way in making the bargain as you have heretofore stated ?

"*A.* Yes, sir.

"*Q.* They have never since paid you back that extra five dollars per acre ?

"*A*. No, sir.

"*Q*. Neither did they, so far as you know, pay Brandt anything?

"*A*. No, sir."

Mr. Algrem was in court, and neither he nor Mrs. Algrem denied the testimony just quoted. The trial judge had the great advantage of seeing the witnesses. We think the complainant very clearly established her case.

The decree is affirmed, with costs.

HOOKER, MCALVAY, BROOKE, and STONE, JJ., concurred.